IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-858

Filed: 6 October 2020

Mecklenburg County No. 18 CVD 14611

CASSIA FERREIRA JORDAO, Plaintiff,

v.

NIVALDO JORDAO, Defendant.

Appeal by Plaintiff from Order for Temporary Parenting Arrangement entered 7 January 2019 and Order for Permanent Custody entered 5 April 2019 by Judge Sean P. Smith in Mecklenburg County District Court. Heard in the Court of Appeals 3 March 2020.

*Plumides, Romano & Johnson, PC, by Richard B. Johnson, for plaintiff-appellant.*

*Myers Law Firm, PLLC, by Matthew R. Myers, for defendant-appellee.*

MURPHY, Judge.

We review custody orders to ensure the findings of fact are supported by substantial evidence, and the conclusions of law are supported by the findings of fact. Where unsupported findings of fact do not undermine the conclusions of law, we uphold the order. Here, each of the custody order's conclusions of law are supported by findings of fact that are supported by substantial evidence; therefore, we uphold the order.

Where a trial court does not find a parent unfit, or visitation with that parent to not be in the best interest of the children, it cannot deny reasonable visitation to that parent. Here, Father was entitled to reasonable visitation, and the trial court did not abuse its discretion in granting him reasonable visitation. The trial court carefully considered the unique circumstances of the parties and did not abuse its discretion by granting visitation in Brazil since Father is unable to exercise visitation in the United States.

## BACKGROUND

Cassia Ferreira Jordao ("Mother") and Nivaldo Jordao ("Father") married in Brazil in 2001, and two children were born of the marriage—"Larry,"[1] the oldest son, and "Nicholas," the youngest son (collectively "the children"). The family moved to the United States on 27 January 2016 on a six-month tourist visa. After the expiration of that visa on 27 July 2016, the family remained in the United States without documentation.

In January 2017, Mother filed for a Domestic Violence Protective Order ("DVPO") based on allegations Father assaulted, threatened, and stalked her. The parties consented to the entry of a DVPO that prohibited Father from assaulting, harassing, or threatening Mother and gave Mother primary custody of the children. However, in June 2017, Father was arrested for violating the DVPO by allegedly

---

[1] Pseudonyms are used for all relevant persons throughout this opinion to protect the identities of the minors and for ease of reading.

stalking Mother at her church. Father claimed he had asked her to meet there to pick up the youngest son. Based on these alleged acts of domestic violence, Mother applied for a U-Visa on 13 December 2017.[2] After his arrest, Father was deported to Brazil due to his illegal presence in the country.

Mother filed for divorce from Father on 24 July 2018. On 24 September 2018, Father filed his answer to the complaint which included a motion to dismiss the absolute divorce claim due to prior pending proceedings in Brazil and a motion for child custody and a temporary parenting arrangement.[3] On 12 December 2018, a hearing for a Temporary Parenting Arrangement ("TPA") was held, and, on 7 January 2019, the trial court entered its order setting out a TPA ("TPA Order"). The TPA Order granted both parties joint legal custody of the children, with Mother having temporary physical custody and Father having visitation in Brazil during the winter and summer school breaks. The TPA Order also required Mother to provide weekly emails to Father regarding the children and to allow communication between the children and Father by email, text, and telephone.

On 22 January 2019, Father filed a *Motion for Contempt* based upon Mother's failure to comply with the TPA Order provisions regarding weekly emails and

---

[2] "A 'U-[V]isa' is a type of visa available to victims of serious crimes who are undocumented immigrants and cooperate with law enforcement in the investigation or prosecution of crimes." *State v. Martinez,* 253 N.C. App. 574, 584, 801 S.E.2d 356, 362 (2017) (citing 8 U.S.C. § 1101(a)(15)(U)).

[3] The DVPO had expired in February 2018, so there was no child custody order in effect in July 2018.

communication with the children. Father also filed another *Motion for Temporary Parenting Arrangement*. On 20 March 2019, Mother filed her reply to Father's motions and counterclaim for child custody, child support, and attorney fees.

On 20 and 21 March 2019, the trial court heard the parties' child custody claims, and on 5 April 2019 the trial court entered an *Order for Permanent Custody* awarding Mother primary legal and physical custody of the children and again granting Father visitation with the children in Brazil.[4] The order also set out detailed provisions regarding communication, decision-making, travel between the United States and Brazil, and the custodial schedule if Mother were to reside in Brazil. Mother timely appealed.

## ANALYSIS

### A. Standard of Review

"In a child custody case, the trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings." *Peters v. Pennington*, 210 N.C. App. 1, 12–13, 707 S.E.2d 724, 733 (2011). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 13, 707 S.E.2d at 733. "Unchallenged findings of fact are binding on appeal." *Id.* (citing *Koufman v.*

---

[4] The order on appeal did not address Father's contempt motion but expressly scheduled that motion for hearing at a later date.

*Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)). "Absent an abuse of discretion, the trial court's decision in matters of child custody should not be upset on appeal." *Everette v. Collins*, 176 N.C. App. 168, 171, 625 S.E.2d 796, 798 (2006).

## B. Challenged Findings of Fact

Here, Mother challenges Findings of Fact 16, 21, 22, 26,[5] 28, 33, 34, 35, 36, 42, 43, and 44 as unsupported by evidence. Below we address each challenged finding of fact to determine if it is supported by substantial evidence.

### 1. Finding of Fact 16

Finding of Fact 16 states:

> 16. The [c]ourt received testimony from an expert in immigration law named P. Mercer Cauley. While it is possible that Mother may receive a U-Visa, it is unlikely that a decision will be made sooner than Spring of 2023, *and it is unlikely that such Visa will be granted based upon the number of application and limits that are currently in place. Although, it is possible that the limits may be increased and she may be successful. Nonetheless, it is unlikely that such a visa will be obtained by Mother that will allow her to stay beyond that point of decision by the federal courts.*

(Emphasis added). The first part of Finding of Fact 16 is supported by the testimony of P. Mercer Cauley ("Cauley"). Cauley testified it is possible Mother will receive a U-Visa, but it would not be adjudicated for 6-7 years from the time of her application because there are 10,000 granted each year and there is a significant backlog. He

---

[5] We note that although Mother and Father both cite to Finding of Fact 25, they refer to the content of Finding of Fact 26, and so we analyze Finding of Fact 26 as opposed to Finding of Fact 25.

also testified Mother did not have to be in the United States to be granted a U-Visa, so if she were to leave the United States then she could later return to the United States if she was granted a U-Visa and a waiver. A waiver would be required for Mother to re-enter the country because she stayed past her former visa and would otherwise be prohibited from returning for 10 years. When asked if he thought the application would be granted, Cauley testified the application would probably get a request for more evidence, and under the current administration "it's probably not a slam dunk." The part of Finding of Fact 16 stating "it is unlikely that [a U-Visa] will be granted" is not supported by any evidence, at least to the extent this finding is interpreted as addressing the *merits* of Mother's waiver request. The evidence did not suggest Mother's U-Visa is unlikely to be granted but the evidence did suggest a delay of several years before this might happen. Although this portion of Finding of Fact 16 is unsupported by evidence, it is not essential to any conclusion of law in this case. *See In re A.Y.,* 225 N.C. App. 29, 41, 737 S.E.2d 160, 167 (2013) ("We agree that this finding of fact is only partially supported by competent evidence. . . . This error is, however, harmless.").

**2. Findings of Fact 21 and 22**

Mother challenges Findings of Fact 21 and 22 together. Findings of Facts 21 and 22 state:

> 21. The [c]ourt faces this decision on the backdrop of the parties' immigration situation, which precludes Father

- 6 -

> from entering the United States and also the Court finds that, based upon Mr. Cauley's testimony, the children will have difficulty re-entering the United States should they depart and leave the United States.
>
> 22. Additionally, should Mother leave the United States, she is likely to have difficulty to return to the United States.

Mother claims these findings of fact improperly suggest there was a possibility of Mother and the children to return, when, in reality, if they left it would be impossible for them to return. In terms of Finding of Fact 21, Cauley stated the children would not be barred from returning for 10 years because as minors "they do not accrue the same unlawful presence," but "they would have to apply for a visa," which would be very unlikely to be granted because they had overstayed one visa already. Additionally, the children would receive U-Visas if Mother was granted one in 2023, so it would be possible for them to return at that time. Although this evidence suggests it is unlikely the children could re-enter the United States, it is not impossible and characterizing this as "the children will have difficulty re-entering the United States" is supported by substantial evidence.

In terms of Finding of Fact 22, Cauley testified that absent a waiver Mother would not be able to return to the United States for 10 years once she left. The trial court heard testimony that the grant of a waiver would allow her to return sooner, and she would likely discover the status of her waiver in 2023 along with her U-Visa application. Again, this evidence suggests it is unlikely that Mother could re-enter

the United States, but it is not impossible and characterizing this evidence as Mother being "likely to have difficulty to return to the United States" is supported by substantial evidence.

**3. Finding of Fact 26**

Finding of Fact 26 states:

> 26. The [c]ourt does not find that Father committed domestic violence upon either child.

Father testified he "[n]ever [has been violent toward his children]. They are there in the courthouse. They can testify if I've ever been violent towards them." Although there was conflicting evidence presented by Mother suggesting Father was violent toward Larry, there was sufficient evidence for the trial court to find Father did not commit domestic violence against either child. Larry specifically corroborated there had been no domestic violence against the children in a letter read into evidence, although he also later testified this letter was generally dishonest and Father asked him to write it. Despite the conflicting evidence, the trial court found Father had not committed domestic violence against the children, and substantial evidence supported this finding in Father's testimony and Larry's testimony.

**4. Finding of Fact 28**

Finding of Fact 28 states:

> 28. The Court was presented with a document which describes the travel advisory for Brazil. However, the specific places which are noted do not include the area around Blumenau.

Although Mother takes issue with this finding of fact on the basis of the implication there is no travel advisory to Brazil, when in reality there is a level two travel advisory for all of Brazil, the express content of the finding of fact is supported by the evidence. Mother presented a document describing the travel advisory in Brazil, and testimony about this document showed there was a level two travel advisory throughout Brazil. However, there was no indication the area around Blumenau where Father lives was noted as having a higher travel advisory level. As a result, there was substantial evidence to support the trial court having been "presented with a document" describing "the travel advisory in Brazil," and "the specific places which are noted [did] not include the area around Blumenau."

**5. Findings of Fact 33, 34, 35, and 36**

Mother challenges Findings of Fact 33, 34, 35, and 36 together. These findings of fact state:

> 33. Mother ignored [Larry]'s poor performance in school that resulted in him dropping out of school and entering an E-learning environment.
>
> 34. She condoned [Larry]'s disregard of the law and did not require him to work despite stating that the reason for his withdrawal was to allow him to work.
>
> 35. Mother provided intentionally incorrect and fraudulent reasons to Charlotte-Mecklenburg Schools for [Larry's] dropout. Mother allowed and encouraged [Larry] to drop out of school and into an E-learning environment due to his association with others who encouraged him to engage in

drug use along with them.  The Court finds such decision was not in [Larry's] best interest.

36. She currently does not adequately monitor [Larry's] online progress and her work schedule precludes her from monitoring whether or not [Larry] is in fact adequately paying attention to his E-learning studies.

Finding of Fact 33 is supported by Mother's testimony characterizing Larry as an "excellent" student at Providence in 9th and 10th grade.  However, in his 10th grade year Larry had only two classes with grades in the 80s or 90s, those being Math 2 with an 84 and Fitness with a 92.  He also had a 71 in American History, a 56 in Biology, a 51 in English 2, a 76 in Spanish 1, a 73 in Sports and Entertainment Marketing, and a 74 in Fitness 2.  Based on the disparity between Mother's characterization of Larry as an "excellent" student and his actual grades, there was substantial evidence to conclude Mother was ignoring his poor performance.  Additionally, there is substantial evidence to support the finding that Larry's poor performance was part of what resulted in him dropping out of school and starting E-learning.  The stated reason for him dropping out was he "need[ed] a better schedule to work and study at the same time," but very quickly Larry stopped working because "he wanted to go back to studying."  The trial court could conclude from this evidence that Larry did not drop out to work, as he worked for only a very short time period after dropping out, and instead he dropped out due to his grades and school environment.

Finding of Fact 34 is also supported by substantial evidence. As mentioned above, Larry dropped out of high school because he "need[ed] a better schedule to work and study at the same time," but very quickly Larry stopped working because "he wanted to go back to studying." Mother testified Larry does not work because he has online classes that require him to be online for a long time. Thus, substantial evidence showed Mother did not require him to continue working despite his withdrawal being for the purpose of working. In terms of Mother condoning Larry's disregard for the law, substantial evidence showed Mother knew of Larry smoking marijuana, drinking alcohol, and skipping school, and did not or could not stop him from doing so.

Finding of Fact 35 is supported by substantial evidence. Mother testified it "was not such a bad thing" Larry was not going to school because he would meet with his friends at school to smoke marijuana. As stated above, Larry left high school to work, but then did not work because he needed to study. After seemingly acknowledging Larry could have gone back to his high school after quitting his job, Mother testified "the environment at [his high school] was not good for him. He had all his friends his age all using marijuana there . . . ." This evidence supports the trial court's finding that Mother allowed and encouraged Larry to drop out of school. Furthermore, it suggests Mother intentionally provided incorrect information and

Larry could have gone back to high school, but she did not require him to return nor did she update the school.

Finding of Fact 36 is partially supported by the evidence. Mother did not know all of the online classes Larry was taking, how many classes he was taking, or his grades in those classes. This constitutes substantial evidence supporting the finding that Mother was not keeping track of or monitoring Larry's online classes. Mother stated she worked from Monday through Friday, 8 A.M. to 12 P.M. If Larry should be in online schooling during this time period, Mother is unable to supervise and ensure he is adequately paying attention to his work. However, there is no evidence of Larry's school hours, and as a result there is no evidence establishing Mother's work schedule precludes her from supervising Larry's work. Although Finding of Fact 36 is partially unsupported by evidence, it is not essential to any conclusion of law in this case. *See A.Y.,* 225 N.C. App. at 41, 737 S.E.2d at 167 ("We agree that this finding of fact is only partially supported by competent evidence. . . . This error is, however, harmless.").

## 6. Findings of Fact 42, 43, and 44

Mother challenges Findings of Fact 42, 43, and 44 together. Findings of Fact 42, 43, and 44 state:

> 42. Mother should have primary physical custody and Father should have secondary physical custody of the minor children as outlined herein. This is in the children's best interest.

> 43. This Court cannot find that Father is an unfit caregiver or that in person contact is not the best interest of the children. Father desperately wants to see, speak to, and play a part in the lives of his children. Despite logistical and legal challenges, [F]ather has pursued this action in a quest to not be indefinitely cut off from his children.
>
> 44. The Court is therefore required not to deny physical visitation by Father with the children.

Findings of Fact 42 and 44 are actually more properly characterized as conclusions of law. "Generally, any determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law. Any determination made by logical reasoning from the evidentiary facts, however, is more properly classified a finding of fact." *In re Foreclosure of Gilbert*, 211 N.C. App. 483, 487, 711 S.E.2d 165, 169 (2011) (internal quotations and citations omitted). Findings of Fact 42 and 44 both require the exercise of judgment and the application of the law controlling custody determinations and visitation. However, Finding of Fact 43 is actually a finding of fact that requires substantial evidence to support it. Findings of Fact 42 and 44 are conclusions of law that require supporting findings of fact. Finding of Fact 43 underlies Findings of Fact 42 and 44, so we first look to Finding of Fact 43.

Finding of Fact 43 is supported by the following evidence: testimony by Luigi Luz suggested Father was a good parent who could be trusted with his children; Larry lived with Father following his parents' separation for several months; Father's

consistent visitation with the younger son; Father wanted a good relationship with his older daughters from another marriage and that motivated his move to the United States; in Brazil, Father sent Larry to a private school to get a higher quality education, and later in the United States they specifically sought out good schools; Father testified to having a very good relationship with the children when they came to the United States initially; Father denied ever being violent toward his children; after he was deported, Father made arrangements to see his children and attempted to purchase flights to Brazil for the children as outlined in the TPA Order; Father testified he had a great relationship with his children, prior to his deportation, and he was trying to be there for them; Father testified "[i]t's everything I want in my life to be near my . . . children[,]" and expressed great concern over his older son's new drug use in the months following Father's deportation; and Father's home in Brazil has a room for each child were they to visit. Thus, despite conflicting evidence, the trial court had substantial evidence to support its finding that it could not find

> Father is an unfit caregiver or that in person contact [was] not the best interest of the children. Father desperately wants to see, speak to, and play a part in the lives of his children. Despite logistical and legal challenges, [F]ather has pursued this action in a quest to not be indefinitely cut off from his children.

Finding of Fact 44, which is actually a conclusion of law, is supported by Finding of Fact 43 and applies N.C.G.S. § 50-13.5(i), which requires "the trial judge, prior to denying a parent the right of reasonable visitation, [to] make a written

finding of fact that the parent being denied visitation rights is an unfit person to visit the child or that such visitation rights are not in the best interest of the child." N.C.G.S. § 50-13.5(i) (2019). Since the trial court did not find Father to be an unfit caregiver or visitation to not be in the best interest of the children, the trial court could not deny Father reasonable visitation. Finding of Fact 42, also a conclusion of law supported by Finding of Fact 43 and N.C.G.S. § 50-13.5(i), correctly found the only reasonable visitation possible was for the children to visit Father in Brazil.

### C. Visitation with Father in Brazil

Mother argues the trial court abused its discretion in awarding Father visitation in Brazil. In issues of child custody, a trial court must make its decision based on the best interest of the children. N.C.G.S. § 50-13.2(a) (2019). To deny a parent custody or visitation, a trial court must find the parent "is an unfit person to visit the child or that such visitation rights are not in the best interest of the child." N.C.G.S. § 50-13.5(i) (2019).

Mother challenges Findings of Fact 42, 43, and 44 as unsupported by substantial evidence, as well as Conclusion of Law 5 as unsupported by the findings of fact. As stated above, Finding of Fact 43 is supported by substantial evidence. Additionally, Findings of Fact 42 and 44 are conclusions of law supported by findings of fact. As a result, we look only to whether Conclusion of Law 5 is supported by the findings of fact.

Conclusion of Law 5 is supported by Findings of Fact 42, 43, and 44. Conclusion of Law 5 states:

> 5. Father shall have secondary custody of the minor children as set forth herein and these provisions are in the best interest[] of the minor children and best promote their health, education and safety pursuant to the provisions of N.C.G.S. § 50-13.2 and other relevant statutory provisions.

There was adequate evidence to support the findings of fact, and the findings of fact support the challenged conclusion of law. As outlined above, the trial court found it could not hold Father was "an unfit caregiver or that in person contact [was] not in the best interest of the children," so it could not deny Father reasonable visitation. *See* N.C.G.S. § 50-13.5(i) (2019). Therefore, Father was entitled to the only reasonable visitation possible in light of his inability to return to the United States— the children visiting him in Brazil.[6] The trial court did not abuse its discretion in granting Father secondary physical custody in the form of visitation in Brazil.

## D. N.C.G.S. § 50-13.2(a)-(b)

Mother contends the trial court abused its discretion by failing to address the following relevant factors of N.C.G.S. § 50-13.2:

> (a) . . . In making the determination[ of who to award child custody], *the court shall consider all relevant factors including acts of domestic violence between the parties, the safety of the child, and the safety of either party from*

---

[6] Under N.C.G.S. § 50-13.2, the trial court was not authorized to order solely electronic visitation. "Electronic communication with a minor child may be used to supplement visitation with the child. Electronic communication may not be used as a replacement or substitution for custody or visitation." N.C.G.S. § 50-13.2(e) (2019).

> *domestic violence by the other party*. An order for custody must include written findings of fact that reflect the consideration of each of these factors and that support the determination of what is in the best interest of the child. . . .
> (b) . . . If the court finds that domestic violence has occurred, the court shall enter such orders that best protect the children and party who were the victims of domestic violence, in accordance with the provisions of [N.C.]G.S. [§] 50B-3(a1)(1), (2), and (3). *If a party is absent or relocates with or without the children because of an act of domestic violence, the absence or relocation shall not be a factor that weighs against the party in determining custody or visitation.* Absent an order of the court to the contrary, each parent shall have equal access to the records of the minor child involving the health, education, and welfare of the child.

N.C.G.S. § 50-13.2(a)-(b) (2019) (emphasis added). This statute requires the trial court to "consider all relevant factors including acts of domestic violence between the parties, the safety of the child, and the safety of either party from domestic violence by the other party." *Id.* The trial court must "include written findings of fact that reflect the consideration of each of these factors and that support the determination of what is in the best interest of the child." *Id.*

In this case, the trial court considered all relevant factors. It considered domestic violence and the past relationship between Mother and Father in Findings of Fact 9 and 10, which found Father accused Mother of dating other men while married, and Father committed domestic violence against Mother. It considered domestic violence in terms of the children in Finding of Fact 26, which found Father did not commit domestic violence against the children. The trial court addressed the

safety and well-being of the children, including the effect of visitation in Brazil, in Findings of Fact 14, 21, 26, 27, 28, 30, 31, 32, 33, 34, 35, 36, 37, 39, 41, 42, 43, and 44, which considered, *inter alia*, the children's lack of health insurance in the United States, their immigration situation, their progress in school, the safety of the home in Brazil, their behavior outside of school, and their compliance with the law in the United States. Although there are no specific findings referring to Mother's safety should she go to Brazil, it is apparent the trial court "considered" the safety of Mother. Findings of Fact 9, 10, 18, 19, 20, 24, 38, 40, and 41 all address the interactions between the parties and the attitude of Father toward Mother. These findings discuss, *inter alia*, the history of domestic violence, Father's anger toward Mother and how he has expressed that anger with criticism, vulgarity, and intimidation of Mother, Father's perception of Mother's behavior, and how the parties have communicated poorly with each other. In light of the trial court's findings considering the history between the parties, the attitudes of the parties, and the interactions between the parties in light of the domestic violence that occurred, the trial court did not err in failing to make a more specific finding of fact. Although there were not any specific findings of fact or conclusions of law referring to this factor, the trial court considered the factor as required by the statute. N.C.G.S. § 50-13.2(a) (2019) ("the court shall consider all relevant factors including acts of domestic violence between

the parties, the safety of the child, and the safety of either party from domestic violence by the other party").

Mother also claims N.C.G.S. § 50-13.2(b) was violated because "the trial court's order is directly contrary to the fourth sentence of" N.C.G.S. § 50-13.2(b), which requires that "[i]f a party is absent or relocates with or without the children because of an act of domestic violence, the absence or relocation shall not be a factor that weighs against the party in determining custody or visitation." N.C.G.S. § 50-13.2(b) (2019). This language does not apply to this situation, or to the extent it could apply, it would apply to Father, not Mother. Father is the only party who has "relocated" to Brazil, at least indirectly due to his own commission of domestic violence. Mother has not relocated or been "absent" due to domestic violence. The plain language of N.C.G.S. § 50-13.2(b) is referring to "the party" who is "absent" or has relocated "with or without the children because of an act of domestic violence." Thus, the trial court was required not to weigh Father's absence or relocation against him in determining custody or visitation. Considering the entire order, the trial court carefully considered the difficult dilemma created by the parties' immigration status to determine the best interest of the children. Although Mother hopes to avoid a future relocation with the children to Brazil because of her fear of future domestic violence, that is not the situation addressed by this statute. The trial court did not err in failing to address this statutory language.

## **CONCLUSION**

The findings of fact challenged by Mother that are unsupported by substantial evidence are not essential to any conclusion of law, and all conclusions of law are supported by the unchallenged or supported findings of fact. The trial court did not abuse its discretion in granting Father visitation in Brazil where the trial court did not find Father to be unfit or visitation to not be in the best interest of the children and visitation in Brazil was the only reasonable visitation available to Father. The trial court complied with N.C.G.S. § 50-13.2(a) as the custody order fully considered the safety of Mother.

AFFIRMED.

Judges BRYANT and STROUD concur.